UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 18-10428-ADB |
| | ) | |
| FRANKLIN FREDDY MEAVE VAZQUEZ, | ) | |
| | ) | |
| Defendant | ) | |

**<u>UNITED STATES' SENTENCING MEMORANDUM</u>**

On September 23, 2018, the defendant was one of seven men working on a commercial fishing vessel fifty miles off the coast of Nantucket. Suddenly, without warning or provocation, the defendant attacked half his coworkers. He killed Javier Sosa ("Sosa"), stabbing and slicing him multiple times in the head, neck, torso, arms, and hands with a long fishing knife. He slammed a hammer into the back of Rafael Herrera ("Herrera")'s head, causing a traumatic brain injury. Then he used the same hammer to smash the head of Juan Zamorano ("Zamorano"), who fell down into the boat's ice hold. The defendant did nothing to try to help his victims after attacking them. Instead, he ran up the rigging and waited on the platform at the top until the Coast Guard, whom the captain had called on the emergency radio channel, arrived hours later.

On March 9, 2022, the defendant pled guilty to all three counts in the indictment: Murder in the Second Degree, in violation of 18 U.S.C. § 1111; Attempted Murder, in violation of 18 U.S.C. § 1113; and Assault with a Dangerous Weapon, in violation of 18 U.S.C. § 113(a)(3). The parties and Probation agree that the defendant's adjusted offense level is 35. Plea Agreement (Doc. No. 111) ℙ 3; PSR ℙ 59. The defendant falls in Criminal History Category II, making his Guidelines sentencing range 188-235 months. PSR ℙℙ 66, 109. The government has agreed to recommend a term of incarceration within the above range. Plea Agreement, ℙ 4(a). The

government now recommends a sentence of 235 months in prison followed by 60 months of supervised release.

## **The Offense Conduct**

The Captain Billy Haver is an 85-foot commercial scalloping vessel. A photo is attached as Exhibit A. The boat left Seaford, Virginia on September 18, 2018, for a scalloping trip expected to take up to two weeks. In addition to the defendant and his three victims, the other persons on board were Jose Araiza ("Araiza"), Julio Munoz ("Munoz"), and Jose Lira Casillas ("Lira"). Araiza was the captain; Sosa was the first mate; and the other five men were scallopers/deckhands. The crew worked the same 18-hour shift and shared a sleeping berth. Everyone spoke Spanish with each other and got along.

Araiza had captained this boat for about ten years. He recently had been out on a trip with a crew that included the defendant. The defendant had done well and worked hard, so Araiza decided to hire him for this trip as well. Herrera and Zamorano also had worked with the defendant on previous trips. Araiza and the crew called the defendant "Freddy" or "Little Freddy."

Zamorano had known the defendant for over a decade and knew that he was addicted to heroin and prescription pills. He had seen the defendant use heroin on land but not at sea. The defendant brought some Percocet pills with him on this trip. The defendant consumed those, and had resorted to crushing and snorting Tylenols, by September 23.

On the morning of September 23, the boat was approximately fifty miles off the coast of Nantucket. The defendant told Captain Araiza that he was quitting because he had injured his knee. Araiza told the defendant to go back to bed. After Araiza told the rest of the crew that the defendant had quit because of a hurt knee, Zamorano, Herrera, and Munoz saw the defendant

trembling all over and with his head dropping. Zamorano chastised the defendant for being "dopesick" and told him to get his act together.

The crew went to work after breakfast. At approximately 11:15 am, Captain Araiza went to bed in his sleeping quarters, located in the main cabin. At some point the defendant joined the rest of the crew on deck. The others were surprised but said nothing about his abbreviated resignation.

The defendant, Herrera, and Munoz were shucking scallops in the shucking house, a structure enclosed on three sides with the fourth side open to the work deck. First Mate Sosa was on the work deck, moving bags of shucked scallops to the ice hold. Zamorano and Lira were in the ice hold, collecting the bags from Sosa.

There was a small table in a corner of the shucking house. Herrera used a hammer to fix the bent blade of his shucking knife, and then placed the hammer on the table and returned to shucking. A photo of the hammer is attached as Exhibit B. The defendant asked Herrera for a drag on his cigarette. Herrera gave his cigarette to the defendant and returned to working. Then, out of nowhere, the defendant grabbed the hammer from the table and smashed it into the back of Herrera's head. Herrera crumpled to the floor and lost consciousness. Munoz cried out, asking the defendant why he had hit Herrera. The defendant falsely claimed that Herrera had tried to cut him with a knife. The defendant then walked over to Sosa and stabbed him multiple times with a long fishing knife. Sosa fell onto the deck and cried out, "Freddy, what did I do to you?" A photo of the knife is attached as Exhibit C.

From down in the ice hold, Zamorano and Lira heard Sosa yelling. Zamorano climbed up the ladder. When he got to the top and stuck out his head, the defendant was standing directly in front of him. The defendant used both hands to raise the hammer above his head and bring it

3

down on the top of Zamorano's head. Zamorano fell down the ladder, bleeding from his head. The defendant closed the heavy hatch cover to the ice hold, with Zamorano and Lira still inside. Then the defendant placed buckets of scallops on top of the cover, making it impossible for the men to get out of the hold on their own.

Herrera regained consciousness and wiped the blood off his face. He saw Sosa lying face up on the deck, twitching, with blood coming out of his mouth and nose. He also saw the defendant, who had the hammer in one hand and the knife in the other. Herrera called out, "What happened?" The defendant told him not to get up. Herrera tried to get up anyway, but the defendant pushed his shoulder down and said, "I told you don't get up."

In the meantime, Munoz had run to the main cabin to wake Captain Araiza. Now Araiza and Munoz ran down the port-side breezeway toward the deck. They saw the defendant toward the end of the breezeway, holding the knife in one hand and the hammer in the other. Munoz heard the defendant say, "Call the police!" The defendant tried to stab Araiza. Araiza grabbed a bucket and swung it at the defendant. It hit the defendant in the forehead, making a small gash that started to bleed. The defendant dropped the knife but kept the hammer. Araiza grabbed the defendant but he broke free. Araiza grabbed a metal rod and threatened the defendant with it. The defendant ran up the rigging to the platform at the top. He kept the hammer with him. A Coast Guard aircraft photo of the defendant sitting at the top of the rigging is attached as Exhibit D.

As Araiza and the defendant were fighting, Herrera heard yelling from inside the ice hold. He struggled to his feet and pushed the buckets of scallops off the hatch cover. This enabled Zamorano and Lira to push open the cover. By the time they came out of the ice hold, the defendant was already on the rigging.

4

On his way up the rigging, the defendant grabbed the boat's EPIRB (emergency position-indicating radio beacon) and activated it, sending a signal to the Coast Guard. Then he used the hammer to break the light at the top of the rigging and to whack at antenna rods. Munoz heard the defendant say that "the president knew about this."

Shortly before 2 pm, Captain Araiza placed a distress call to the Coast Guard, saying, "We have a man gone crazy here on the boat . . . . We have one man I can't wake. I don't know if he's dead or what. But one of the crew members went crazy. He started hitting people in the head with a hammer. I got three men that's injured right now. One I can't wake him up; I don't know if he's dead or not. But I got the man that's on top – he's on the rigging. Right now he's on the rigging. He's already cut the antenna or something off."

Several boats heard the distress call. One was a scalloping vessel called the Master James. When the Master James pulled alongside the Captain Billy Haver, Munoz heard the defendant yell from atop the rigging that the crew wanted to rape him. Zamorano heard the defendant yell, "Call the chopper. They were trying to rape me."

Another vessel that heard the distress call was a German cruise ship called the Mein Schiff 6. When the cruise ship got close, it sent over a rescue boat with medical staff. The rescue boat took Sosa and Herrera back to the cruise ship. A doctor aboard the ship declared Sosa dead. Photos of Sosa are attached as sealed Exhibit E. Photos of Herrera are attached as sealed Exhibit F. Zamorano declined to go to the cruise ship. When he arrived in Boston, he was taken to a hospital and treated and released for his head wound. Photos of Zamorano are attached as sealed Exhibit G.

The defendant stayed on the platform at the top of the rigging until a Coast Guard cutter approached the scene. The cutter sent an inflatable boat carrying six Coast Guard officers to the

Captain Billy Haver. The six officers boarded the vessel and secured it. Then, with officers pointing their weapons at him, the defendant came down from the rigging and was taken into custody. As he was being handcuffed he said, "I am not a criminal." He was brought aboard the cutter. The defendant told one of the officers that Captain Araiza had struck him multiple times with a metal bar, which was false.

When the cutter arrived in Boston, FBI agents met the boat, took custody of the defendant, and brought him to Massachusetts General Hospital, where he was treated for his forehead cut. After signing a *Miranda* waiver, the defendant told agents that he "might" have been raped on the boat one night when all the crewmembers were asleep in the berth, and that he "kinda woke up in the middle of it." The defendant's allegation was false.

When the cruise ship arrived in Boston, Herrera was taken by ambulance to MGH, where he received inpatient treatment for five days.

The medical examiner concluded after an autopsy that multiple stab wounds were the cause of Sosa's death. These included one stab wound to the neck and four to the torso, plus incisions and blunt force injuries to the head and right arm and hand.

### Defendant's Mental Illness

[SEALED]

### Sentence Recommendation

The government recommends a sentence of 235 months' imprisonment and 60 months' supervised release. A sentence at the high end of the GSR is warranted for several reasons.

The defendant's attacks were violent and brutal. They were unprovoked, face-to-face attacks – both deeply personal and motiveless. The victims had no reason whatsoever to suspect that the defendant would attack them. On the contrary, for five days the crew had worked

6

collegially on long shifts and had shared a sleeping berth. The victims had no opportunity to try to defend themselves: The attacks came out of the blue; the victims had no time to find weapons to try to fight back; and they had nowhere to run or hide on a small boat out at sea.

After attacking the victims the defendant had the opportunity to try to help them. But he chose not to. Instead he ran up the rigging and waited on the platform at the top until the Coast Guard arrived and pointed their weapons at him, leaving him no option but to descend. We will never know whether the defendant could have saved Sosa, or at least offered him some comfort during the last moments of his life. The defendant showed no remorse, no kindness, no humanity.

The defendant refused to accept responsibility for his actions even after Sosa died and Herrera was sent to the hospital with serious injuries. Instead, he slandered his victims by falsely alleging that they and the other crewmembers had tried to rape him.

The effects of the defendant's crimes are ongoing even today. Sosa, a naturalized citizen originally from Mexico, had worked on fishing boats – hard, physical labor – for decades to support his wife and two sons. He was 54 years old. His family continues to grieve.

Herrera is also a naturalized citizen originally from Mexico. At the time of the attack, when he was 41 years old, he had worked for eighteen years as a commercial fisherman, supporting his wife and two daughters. The defendant's attack caused a traumatic brain injury. It is described in Herrera's medical records as "bifrontal parenchymal contusions with associated subarachnoid hemorrhage and likely extra-axial hematoma along the right frontal pole." To this day Herrera suffers from neck and shoulder pain, headaches, dizziness, and memory lapses. His impairments are so debilitating that he can no longer work on fishing boats. In fact, he has not

been able to work at all except driving for Door Dash for a few months and occasionally washing cars.

All of the Section 3553 factors support a long term of imprisonment. The defendant's offenses were brutal and unprovoked, with devastating consequences for the victims, including Mr. Sosa's family. A sentence of 235 months will reflect the seriousness of the defendant's crimes, promote respect for the law, and provide just punishment. The recommended sentence will promote both individual and general deterrence. It will provide the defendant with much-needed mental health and substance abuse treatment. It will permit mental health professionals to keep the defendant on antipsychotic medications to try to ensure that he does not become violent again. And it will provide him with educational and vocational training that he will need in order to re-enter society when he completes his sentence. The defendant does not have a high school diploma or GED. PSR ¶ 100. His only work experience is as a scalloper. *Id.* ¶ 103. That occupation is no longer open to him. After the defendant's unspeakable crimes, it is safe to say that he will never find another job on a fishing vessel.

For all of these reasons, the government believes the recommended sentence is sufficient, but not greater than necessary, to comply with 18 U.S.C. § 3553.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:   */s/ Christine Wichers*
      CHRISTINE WICHERS
      LAURA KAPLAN
      Assistant U.S. Attorneys

8

**<u>Certificate of Service</u>**

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on August 5, 2022.

<u>/s/ Christine Wichers</u>
Christine Wichers